UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

v.

TRACY NELSON,

        Defendant.
_____/

CRIMINAL NO. 07-20472

DISTRICT JUDGE VICTORIA A. ROBERTS

MAGISTRATE JUDGE DONALD A. SCHEER

## REPORT AND RECOMMENDATION

**I.**   **RECOMMENDATION**:

I recommend that Defendant Tracy Nelson's Motion to Suppress Evidence be denied.

**II.**   **REPORT:**

    **A.**   **Procedural History**

Defendant Tracy Nelson was charged by Grand Jury Indictment, on September 25, 2007, with Conspiracy to Possess With Intent to Distribute Cocaine (Count I) and Possession With Intent to Distribute Cocaine (Count IV). Counsel was appointed, and Defendant entered a not guilty plea on September 26, 2007. On October 17, 2007, Defendant filed a Motion to Suppress Physical Evidence. The motion was referred to the magistrate judge by Order of Reference on October 19, 2007. The government filed its Brief in Opposition to the motion on November 14, 2007.

Defendant's motion was brought on for hearing on December 17, 2007, January 25, 2008 and April 4, 2008.[1]  The motion was taken under advisement, and the parties were directed to submit supplemental briefs.  Defendant submitted his supplemental brief on June 6, 2008.  The government filed its Supplemental Brief on July 10, 2008.  Defendant filed a Reply Brief on July 23, 2008.

**B.    Factual Record**

Defendant Nelson is one of five individuals charged in the conspiracy count.  The instant Motion to Suppress is one of four filed in the case.  The motions were brought on for hearing together.  In a Report and Recommendation of September 23, 2008, I recommended that the Motion to Suppress filed by Co-Defendant Cardell Clinton Campbell be denied.  That report contains various findings of fact, each of which is incorporated into this Report by reference.  On October 7, 2008, a second Report and Recommendation was submitted with respect to the Motion to Suppress filed by Co-Defendant Rodney R. Sierz.  That report contained additional findings of fact, which are also incorporated into this Report by reference.  Because the facts relating to law enforcement contacts with Campbell and Sierz establish a context essential to the proper evaluation of law enforcement activity vis-a-vi Defendant Nelson, I offer the following abbreviated summary.

On September 14, 2007, members of the FBI Violent Crime Task Force were engaged in an active investigation of Cardell Clinton Campbell.  The investigation had commenced during the previous month, based upon information received from a

---

[1] Each session of the evidentiary hearing resulted in a separate volume of transcript.  The volumes are designated T1 (December 17, 2007), T2 (January 25, 2008) and T3 (April 4, 2008).

confidential informant ("CI"). The informant reported that an individual known to him as "Skip" was a multi-ounce level cocaine dealer from whom he had purchased drugs on prior occasions. The CI provided a physical description of Skip. In addition, he provided the suspect's address (6700 Iowa Street, Detroit, Michigan) and indicated that he drove a green Cadillac. Utilizing the CI information, the task force identified the suspect as Clinton Campbell. The informant confirmed the identification based upon Campbell's Michigan driver's license photo. A criminal history check revealed that Campbell had a record of conviction for felony drug offenses. The accuracy of the informant information was confirmed by means of a "controlled purchase" of drugs by the informant from Campbell, under task force surveillance, during the two week period preceding September 14, 2007. The CI alerted the task force that Campbell had "just recently hooked up with a supply of a couple of kilogram quantities of cocaine which he was off-loading for approximately $25,000.00 per kilogram."

Task force agents were engaged in surveillance of Campbell's Iowa Street residence on September 14, 2007. Campbell and a female companion were observed to depart that location in a green Cadillac. They were followed to 12666 Mendota Street, in Detroit, where the Cadillac was seen to enter the driveway. Task force surveillance was unable to observe the Cadillac or its occupants' activities at the Mendota address. By the time the moving surveillance was able to return to that location, the Cadillac was observed backing out of the driveway, only a few minutes after its arrival. Based upon that observation, the information from the confidential source and Defendant's prior criminal history, Agent Malagrida suspected that Campbell had conducted a drug transaction at the

Mendota location. An order was issued by radio that the green Cadillac should be subjected to a traffic stop.

A unit of the Wayne County Sheriff's Department had participated in a Violent Crime Task Force meeting during the morning of September 14, 2007. Deputies Lilly and Smith were informed of Campbell's status as a drug trafficking suspect, and of the information provided by the confidential informant. They were instructed to stand by for a possible signal to stop Campbell's vehicle for an observed traffic violation. That signal was given following the departure of the green Cadillac from the Mendota address, and Lilly stopped Campbell's vehicle after observing an unsignaled turn. Based upon the task force briefing, Campbell's extreme nervousness upon his approach, and his sighting of what he concluded to be an effort on the part of the female passenger to conceal something in the vehicle, Lilly summoned a certified narcotics detection canine unit. Based upon the positive alert of the dog, Lilly recovered from the green Cadillac approximately one kilogram of a substance which tested positive for cocaine. Campbell was taken into custody. (See 9/23/08 R&R, Docket #73, Pages 2-10).

At approximately 3:15 p.m. on September 14, 2007, task force surveillance agents observed a white Cadillac, occupied by two subjects identified as Defendants Thrillden Holmes and Matt Stewart, leave the 12666 Mendota Street residence. Both Holmes and Stewart were identified by name and driver's license photograph, and each was determined to have a prior drug conviction. At approximately 4:28 p.m., after the cocaine seizure from Campbell, a tan Ford Explorer was observed arriving at the Mendota address. The Explorer was occupied by a white female driver and a white male passenger. A record check on the registration tag revealed that the Explorer was owned by Kelly Jo Lamero, of

Grand Rapids. The vehicle was parked on the street in front of the residence, and both occupants remained inside. The male was observed to be using a telephone.

At approximately 4:48 p.m., the white Cadillac returned to 12666 Mendota and proceeded up the driveway to the rear of the residence. At approximately 4:50 p.m., the tan Explorer pulled into the driveway behind the white Cadillac. Both vehicles were then out of sight of the surveilling agents. At approximately 4:55 p.m., the Explorer departed the Mendota address.

The tan Ford Explorer proceeded, under surveillance, from Mendota Street to west-bound I-96. As it proceeded on that roadway, Task Force Agent Art Wimmer maneuvered his Suburban surveillance vehicle to a position abreast of the passenger side of the Explorer. Wimmer observed Defendant Sierz in the passenger seat, holding a plastic bag that appeared to contain a box. Wimmer noted that the Defendant was smiling as he looked into the bag. Wimmer then saw the passenger lean toward the back of the seat and place the bag behind the driver's seat. Both Sorce and Wimmer were in plain clothes and were operating unmarked vehicles. Upon receiving a radio report of Wimmer's observations, Special Agent Sorce directed Wimmer to make arrangements for a marked police unit to stop the tan Explore. At Wimmer's request, a Livonia Police Department scout car stopped the vehicle on I-96 near the Levan Street exit.

Special Agent Sorce was following behind the tan Explorer when he received Wimmer's report of Sierz holding and looking into the package. When he arrived at the vehicle stop on I-96 and Levan, he saw the Livonia Police Officers bringing the female driver toward the rear of the Explorer. She was identified as Kelly Jo Lamero, the owner. Sorce identified himself, advised Lamero of her rights, and "asked where they had been,

5

or basically what they were doing in Detroit." Lamero responded that she and her boyfriend had left Grand Rapids, driven to a mall to purchase shoes, and were returning to Grand Rapids. Sorce asked her if there were any narcotics in the car. She said that there were none to her knowledge. Sorce then asked for consent to search the vehicle. Lamero granted consent.

As Agent Sorce was communicating with the Ms. Lamero, Wimmer was at the side of the Explorer. As the passenger (Sierz) got out of the vehicle, Wimmer walked him back behind it. At that point, Sorce informed Wimmer that he had obtained consent from the owner to search the vehicle. Wimmer returned to the Explorer and found the same plastic bag that he had previously observed. Inside of the bag was a shoe box. Inside of the shoe box was "like a brick of cocaine," approximately eight inches long and two inches thick. There was no other bag in the Explorer. Lamero and Sierz were taken into custody by the Livonia Police Department and transported from the scene. The task force members returned to the Mendota Street location to resume surveillance. (See 10/7/08 R&R, Docket #76, Pages 4-6).

In addition to the above facts, I enter the following summary as my findings of fact in connection with Nelson's Motion to Suppress Evidence.

Shortly after learning of the drug seizure from the tan Ford Explorer, and the arrest of Defendant Sierz, Special Agent Hartman observed Defendant Stewart depart from 12666 Mendota Street in his black Ford Windstar van. (T2: 169-70). He followed the vehicle to the Family Dollar Store at the corner of Joy Road and Evergreen. He watched Stewart park next to a red Dodge pick-up truck, get out of his own vehicle and enter the passenger side of the red truck. Stewart remained there for a few minutes, and then returned to his

own black van and departed. (T2: 169-70; T3: 65-69). Hartman decided to follow the red truck. He was the sole surveillance agent, and radioed for assistance. Task Force Agent Wimmer responded. (T2: 170).

Hartman surveilled the red Dodge as it proceeded to a residential area. At that point, the driver got out and met with two unidentified individuals. The driver then went into the rear of the truck's cap, retrieved a package and showed its contents to the two associates. He then returned the package to the rear of the cab. (T3: 59-60; 69-73). Hartman described the package as "like a light tan plastic bag" which appeared as though "[i]t had some weight in it." "It looked like a package of pencils." (T3: 72). Hartman followed the red truck and contacted the Detroit Police Department to arrange for a marked car to join in the pursuit, conduct a traffic stop, identify the subject and identify the contents of the package. (T3: 60, 75). He met with two DPD Officers and told them that he believed he had just seen a narcotics transaction. He further told them that the subject had shown the package to two associates, and that he needed to identify the person and the contents of the package. He also relayed that the subject had met with Stewart, who had been convicted of a narcotics offense and that the task force "had taken off a kilo or more - - ." (T3: 77). Hartman wanted the marked unit to pull the vehicle over for narcotics trafficking. He told them that he wanted them "to do a traffic stop," but he did not specify what kind of traffic stop. (T3: 78).

Michael Garrison was employed as a Detroit Police Department patrol officer on September 14, 2007. (T3: 6). He and his partner, Officer John Petty, met with Hartman on West Chicago Street, just west of West Parkway, in response to a call from their dispatcher. Hartman told the officers that the driver of a 2007 red Dodge pick-up truck had

7

been observed conducting a narcotics transaction, and that Hartman wanted the officers to make a traffic stop of the vehicle. (T3: 14-16). The officers remained in place for approximately 20-30 minutes, at which time they were notified that the truck was on the move and informed of its heading. Garrison first observed the red Dodge on West Parkway, north of Joy Road. (T3: 7, 17). Garrison observed Hartman's undercover vehicle following behind the suspect vehicle. (T3: 19). The red truck turned from southbound West Parkway to eastbound Joy Road in the left lane. Garrison observed that it had an ornament dangling from the rear view mirror and that the truck then changed lanes without use of a turn signal. (T3: 7, 21). Garrison activated his emergency lights for a traffic stop. The red truck immediately pulled over. (T3: 7, 25-26).

Officer Garrison approached the driver's side of the red Dodge pick-up and requested that the driver produce his driver's license, registration and proof of insurance. The driver of the red Dodge pick-up was Defendant Tracy Nelson. (T3: 9). Nelson questioned why he was being stopped. (T3: 8, 27-28). Initially, the driver's window was open only approximately two inches. Garrison instructed the Defendant to put the window all the way down, and he complied. (T3: 8, 27-28). The officer found that Nelson's paperwork was in order, and he told him of the improper lane change and the dangling ornament. The Defendant continued to question the stop. (T3: 8, 28). Officer Garrison detected a strong "chemical odor" coming from inside the vehicle. He characterized it as similar to the smell of an auto dealer's paint booth or paint remover. (T3: 8, 29). Garrison testified that, in past experience, he had smelled that odor associated with narcotics. (T3: 30). He ordered Nelson out of the vehicle. (T3: 8, 30). The Defendant's questioning conduct, together with the chemical odor from inside the vehicle led Garrison to believe

8

there may have been narcotics inside. (T3: 9, 30). As the Defendant cleared the driver's doorway, Garrison observed a tan plastic shopping bag on the rear floorboard of the passenger side of the truck. Sticking out from the shopping bag was a clear ziplock baggie containing a white powder substance. (T3: 8-9, 31-32). Officer Garrison handed Nelson off to his partner and went around to the passenger side of the red truck to recover the suspected narcotics. He opened the door, seized the package and placed it in evidence. (T3: 9, 34). Nelson was placed under arrest. (T3: 35). Officer Garrison did not issue a citation for either of the traffic violations, in view of Defendant's arrest for drug possession. (T3: 26-27).

### C. Analysis

Defendant Nelson initially argued that the evidence seized as a consequence of the stop of his vehicle by Officer Garrison must be suppressed because the traffic stop was pretextual, as it was conducted in the hope of obtaining evidence to support a drug charge. (Defendant's Memorandum in Support of Motion to Suppress Evidence, Docket #59). Following the government's Supplemental Brief in Opposition (Docket #66), Nelson asserted the additional arguments that the government had failed to establish probable cause, or even reasonable suspicion, sufficient to warrant the traffic stop, and that the subsequent search of his vehicle was unlawful for lack of a warrant, consent, or probable cause.

#### 1. Pretextual Traffic Stop

The Fourth Amendment to the Constitution of the United States guarantees "[t]he right of the people to be secure in their persons, houses, papers and effects, against

unreasonable searches and seizures." U.S. Const., Am. IV. When an officer, by force or show of authority, has restrained the liberty of a citizen such that, in view of all the circumstances surrounding the incident, a reasonable person would believe that he was not free to leave, a seizure has occurred. U.S. v. Mendenhall, 446 U.S. 544, 554-55 (1980). The temporary detention of an individual during a police stop of a vehicle, regardless of the limited purpose or the duration constitutes a "seizure" within the meaning of the Fourth Amendment. Whren v. United States, 517 U.S. 806, 809-10 (1996); Delaware v. Prouse, 440 U.S. 648, 653 (1979). The stop of an automobile is reasonable, however, if police have probable cause to believe that a traffic offense has occurred. Id.

Officer Michael Garrison testified unequivocally that he observed Nelson's vehicle turn eastbound on Joy Road, traveling in the left lane. After Defendant had traveled 30 to 40 yards, Garrison observed the red truck "go from the left lane to the right lane without signaling." Garrison activated his squad car lights and effected a traffic stop. He estimated that only a few seconds elapsed between his observation of the illegal ornament and Defendant's unsignaled lane change. Defendant argues that this uncontroverted evidence "suggests" that Defendant was complying with normal traffic laws. I simply disagree. Garrison's unrebutted testimony is that the turn onto Joy Road and the unsignaled lane change were separate maneuvers, 30 to 40 yards apart. Michigan law requires a turn signal prior to a lane change. MCLA 257.648(1); People v. Hrlic, 277 Mich.App. 260 (2007). There simply is no evidence that Nelson signaled his lane change. Nor is there any evidence that his vehicle did not have the ornamentation to which Garrison testified. Ornaments which obstruct a driver's view are prohibited by Michigan law. MCLA 257.709(1)(c). While the testimony does not confirm that the ornamentation in Nelson's car

10

was obstructive of his view, it is clear that Garrison was able to see it from his own vehicle traveling behind the Defendant. Michigan law requires nothing more than a particularized suspicion, based on an objective observation of the totality of the circumstances, that an ornament is obstructive, in order to justify an investigatory stop of a motorist. People v. Fisher, 463 Mich. 881 (2000). I am fully satisfied that the evidence in this record satisfies that standard.

Defendant further suggests that this court should invalidate Garrison's traffic stop because the officer did not issue a citation for either of the traffic offenses. Garrison testified that he elected not to issue citations because Nelson had been placed under arrest for possession of controlled substances. As stated in my Report and Recommendation regarding Defendant Campbell (Docket #73), I find nothing in the failure to issue a citation which would serve to undermine the credibility of the officer's sworn testimony regarding the traffic violations. Just as the issuance of a ticket (or the filing of a Complaint or Indictment) is not evidence that an offense occurred, the failure to issue a citation is not evidence that it did not. Garrison testified that the issuance of traffic citations is a matter within his discretion, and he provided a reasonable explanation for his election not to issue them in this instance.

The main thrust of Nelson's argument is not an attack on Garrison's credibility. Rather, Defendant claims that the traffic stop, even if warranted under state law, was a mere pretext intended to further an investigation of possible drug offenses. He maintains that the exploitation of mere traffic offenses for that purpose is violative of his constitutional rights. He relies heavily upon Amado-Gonzalez v. United States, 391 F.2d 308 (5th Cir. 1968) wherein the court expressed concern over ". . . the danger that the lowly offense of

a traffic violation - of which all of us have been guilty at one time or another - may be established as the basis for searches circumventing the rights guaranteed by the Fourth Amendment." Id. at 318. It must be observed, however, that Amado-Gonzalez was expressly reversed by the 5th Circuit more than twenty years ago in United States v. Causey, 834 F.2d 1179, 1184-85 (5th Cir. 1987).

The law has developed significantly since the long discredited case upon which Nelson relies. I agree with the Defendant that Officer Garrison's objective in the traffic stop of the red Dodge truck was the advancement of a drug trafficking investigation. The Supreme Court has declared, however, that when police have probable cause to believe that a traffic offense has occurred, their subjective intentions play no role in ordinary Fourth Amendment probable cause analysis. Whren v. United States, 517 U.S. 806 (1996). The Court rejected "the idea that an ulterior motive might serve to strip the agents of their legal justification." Id. at 813. Even before Whren was decided, the Sixth Circuit held that, so long as an officer had probable cause to believe that a traffic violation had occurred, a resulting stop would be lawful, regardless of what else the officer knew or suspected about the traffic violator at the time of the stop. United States v. Ferguson, 8 F.3d 385, 391 (6th Cir. 1993), cert. denied, 513 U.S. 828 (1994). Case law since Whren has reaffirmed the proposition that an officer who has probable cause to believe a civil traffic violation has occurred may stop the vehicle regardless of his or her subjective motivation for doing so. United States v. Akram, 165 F.3d 452, 455 (6th Cir. 1999). I accept Officer Garrison's uncontroverted testimony that he observed the ornamentation and unsignaled lane change prior to his traffic stop of Nelson's truck. Because I find that he had probable cause to believe that traffic violations had occurred, the fact that he was assisting in a drug

trafficking investigation by the Violent Crime Task Force does not establish a violation of Nelson's Fourth Amendment rights.

## 2. Probable Cause/Reasonable Suspicion

Even if Nelson had not committed a traffic violation, I am satisfied that Officer Garrison's action in stopping Defendant's vehicle did not violate the Fourth Amendment. Garrison's involvement with the Defendant resulted from his conference with Special Agent Hartman. Garrison recalled that Hartman requested that he stop the red Dodge truck because its driver had been involved in a narcotics transaction while under task force surveillance. It is well established that, even in circumstances in which an arresting officer has nothing more than a bulletin from another police organization that a person is suspected of a criminal offense, and investigatory stop of the subject is constitutionally justifiable by objective reliance on the bulletin, so long as the police who issued it possessed a reasonable suspicion justifying the stop. United States v. Hensley, 469 U.S. 221 (1985). "A primary focus in the imputed knowledge cases is whether the law enforcement officers initiating the search or arrest, on whose instructions or information the actual searching or arresting officers relied, had information that would provide reasonable suspicion or probable cause to search or arrest the suspect." United States v. Colon, 250 F.3d 130, 135-36 (2nd Cir. 2001). In the instant case, the requesting authority for the traffic stop of Nelson's vehicle was the FBI Violent Crime Task Force, through its representative member, Agent Hartman. "[T]he evidence uncovered in the course of the stop is admissible if the police who issued the flyer or bulletin possessed a reasonable suspicion justifying a stop, and if the stop that in fact occurred was not significantly more intrusive than would have been permitted the issuing department." Hensley, 469 U.S. at 228.

13

Special Agent Hartman was a member of the Violent Crime Task Force and a participant in its investigation of Cardell Campbell. He was an active participant in the task force activities of September 14, 2007. Hartman knew that Campbell, as well as Defendants Holmes and Stewart, were convicted drug offenders. He was actively involved in the surveillance of Campbell to 12666 Mendota Street. He knew that a quantity of cocaine had been seized from Campbell immediately after his departure from that location. Hartman also assisted in the task force activities leading to the arrest of Defendant Sierz, and the recovery of still more cocaine, immediately after his departure from the same Mendota Street location. Hartman personally surveilled Defendant Stewart as he departed the Mendota Street property and traveled in the black Ford Windstar to the Family Dollar Store parking lot. He watched as Stewart entered the red Dodge truck, only to return to his own vehicle minutes later. He personally followed the red Dodge to a residential area, where he observed the driver display a tan colored package to two associates, only to return it to the truck.

> The process does not deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated certain common sense conclusions about human behavior; jurors as fact finders are permitted to do the same - - and so are law enforcement officers. Finally, the evidence thus collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement.

United States v. Cortez, 449 U.S. 411, 418 (1981). Special Agent Hartman was an experienced law enforcement officer. His observations of Stewart's contact with the red Dodge, and Nelson's subsequent actions, led him, in the light of his experience, to conclude that a transfer of controlled substances had occurred.

14

> [P]robable cause is a fluid concept - turning on the assessment of probabilities in particular factual context - not readily or even usefully, reduced to a neat set of legal rules. While an effort to fix some general, numerically precise degree of certainty corresponding to probable cause may not be helpful, it is clear that only the probability, and not a prima facie showing, of criminal activity is the standard of probable cause.

Illinois v. Gates, 462 U.S. 213, 232 (1983). Hartman knew the criminal backgrounds of the individuals associated with the Mendota location. He knew that two vehicles stopped shortly after contact with that place, and before any other contacts, were found to contain controlled substances. He personally surveilled the black Ford Windstar from Mendota to the Family Dollar Store, where he observed Stewart engage in conduct consistent, in Hartman's experience, with drug distribution activity. From that point, he surveilled the red truck and observed its driver display a package to two associates before returning it to the truck. The red Dodge remained under task force surveillance while Hartman made contact with Officer Garrison and his partner. While it may be possible to conceive of innocent explanations for the events witnessed by Hartman, I am satisfied that his conclusion that drug distribution activity had occurred was fully warranted.

> [J]udges are not philosophers. To find probable cause, the law does not require that we rule out every conceivable explanation other than a suspect's illegal conduct. Instead, we need only consider whether there are facts that, given the factual and practical considerations of every day life, could lead a reasonable person to believe that an illegal act has occurred or is about to occur.

United States v. Strickland, 144 F.3d 412, 416 (6th Cir. 1968). I am fully satisfied that the information possessed by Special Agent Hartman at the time of his request that Officer Garrison stop the red Dodge truck established "reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion," that there was a "fair

probability that contraband or evidence of a crime" would be found in the red Dodge truck. United States v. Padro, 52 F.3d 120, 122-23 (6th Cir. 1995).

It is important to note that a finding of probable cause is not essential to the propriety of the encounter between Officer Garrison and Nelson. A law enforcement officer may conduct an investigatory stop if it is supported by "reasonable suspicion" of criminal activity. Terry v. Ohio, 392 U.S. 188 (1968); United States v. Garcia, 496 F.3d 495 (6th Cir. 2007). The Supreme Court has declared that reasonable suspicion is a less demanding standard than probable cause, and requires only some minimal level of objective justification for making the stop. United States v. Sokolow, 490 U.S. 1, 7 (1989) (citing INS v. Delgado, 466 U.S. 210, 217 (1984)). "[T]he evidence . . . collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement." United States v. Cortez, 449 U.S. 411, 418 (1981). The Court recognized that trained law enforcement officers may legitimately draw "inferences and deductions that might well elude an untrained person." Id. at 418. Viewing the totality of the circumstances known to Special Agent Hartman at the time he requested Officer Garrison to stop Nelson's truck, I am satisfied that he had gathered specific and articulable facts which gave rise to a reasonable suspicion that evidence of drug trafficking might be found there.

Accordingly, Officer Garrison's objective reliance upon Special Agent Hartman's request for the investigative stop was sufficient to withstand a Fourth Amendment challenge. United States v. Hensley, 469 U.S. 221, 232 (1985) ("[I]f a flyer or bulletin has been issued on the basis of articulable facts supporting a reasonable suspicion that the

wanted person has committed an offense, . . . reliance on the flyer or bulletin justifies a stop to check identification").

A vehicle stop "is more akin to an investigative detention rather than a custodial arrest," and the principles announced in Terry v. Ohio apply. Any detention following the initial stop must not be excessively intrusive, and the officer's actions must be reasonably related in scope to the circumstances justifying the seizure. In the case at bar, Officer Garrison immediately requested Nelson's driver's license and vehicle documentation. That procedure was fully appropriate, whether the initial stop was based on probable cause to believe a traffic violation had occurred, or reasonable suspicion of drug possession. It was in the process of securing Defendant's basic identification information that Garrison detected the strong chemical odor emanating from the interior of the vehicle. The officer testified that he had encountered the same chemical odor in prior experiences involving narcotics. Where an officer detects the odor of controlled substances during a legitimate investigative stop of a vehicle, he has probable cause to believe that controlled substances are in the vehicle. United States v. Garza, 10 F.3d 1241, 1242 (6th Cir. 1993). In fact, our Circuit has held that the odor of controlled substances, in itself, constitutes probable cause to search the interior of a vehicle. United States v. Crumb, 2008 WL 2906770 (6th Cir.) (unpublished). In Garza and Crumb, the odor was associated with marijuana, and it may be argued that the scent was specific only to a controlled substance. Officer Garrison testified that the odor in Nelson's truck was similar to automotive paint products, but that he had experienced it associated with narcotics as well. At the very least, the presence of that odor heightened the level of reasonable suspicion that Defendant had drugs in the vehicle. That increased suspicion warranted further investigation. Officer Garrison did not

17

immediately initiate a search of Nelson's vehicle. Rather, he simply directed the Defendant to exit from the truck. The Supreme Court has held that, once a motor vehicle has been lawfully detained, a police officer may order the driver to get out of the vehicle without violating the Fourth Amendment. Pennsylvania v. Mimms, 434 U.S. 106, 111 (1977).

> The police have already lawfully decided that the driver shall be briefly detained; the only question is whether he shall spend that period sitting in the driver's seat of his car or standing along side it. Not only is the insistence of the police on the latter choice not a "serious intrusion upon the sanctity of the person," but it hardly rises to the level of a 'petty indignity.'

Id. (citing Terry v. Ohio, supra, 392 U.S. 1, 17 (1968)). Garrison had a legitimate interest in preserving the status quo until his suspicion could be addressed. As Nelson cleared the driver's doorway in compliance with Garrison's request, the officer observed the package containing a white powdered substance on the floor of the truck. Garrison made that observation from his position outside the driver's side of the vehicle. Based upon his experience as a police officer, he determined that the powder was probably cocaine. That observation clearly established probable cause to believe the truck contained contraband. "If a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment . . . permits police to search the vehicle without more." Pennsylvania v. Labron, 518 U.S. 938, 940 (1996).

For all of the above reasons, I recommend that Defendant Nelson's Motion to Suppress Evidence be denied.

**III. NOTICE TO PARTIES REGARDING OBJECTIONS:**

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. Section 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. United States v. Walters, 638 F.2d 947 (6th Cir. 1981), Thomas v. Arn, 474 U.S. 140 (1985), Howard v. Secretary of HHS, 932 F.2d 505 (6th Cir. 1991). Filing of objections that raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. Smith v. Detroit Federation of Teachers Local 231, 829 F.2d 1370, 1373 (6th Cir. 1987), Willis v. Secretary of HHS, 931 F.2d 390, 401 (6th Cir. 1991). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall not be more than five (5) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

s/Donald A. Scheer  
DONALD A. SCHEER  
UNITED STATES MAGISTRATE JUDGE

DATED: October 15, 2008

---

**CERTIFICATE OF SERVICE**

I hereby certify on October 15, 2008 that I electronically filed the foregoing paper with the Clerk of the Court sending notification of such filing to all counsel registered electronically. I hereby certify that a copy of this paper was mailed to the following non-registered ECF participants on October 15, 2008: **None.**

s/Michael E. Lang  
Deputy Clerk to  
Magistrate Judge Donald A. Scheer  
(313) 234-5217